J-S28001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPT. OF: L.M.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.H. | |
| Appellant | No. 228 MDA 2015 |

Appeal from the Order Entered January 5, 2015
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2014-0092

BEFORE:  BOWES, ALLEN, and LAZARUS, JJ.

MEMORANDUM BY BOWES, J.:                     **FILED JUNE 15, 2015**

M.H. ("Father") appeals from the order entered on January 5, 2015, wherein the orphans' court involuntarily terminated his parental rights to his four-year-old son, L.M.H.[1]  We affirm.

The first contact between York County Office of Children and Youth Services ("CYS") and this family occurred on April 2, 2013, in relation to a referral alleging a lack of supervision by paternal grandmother ("Grandmother"), V.H., with whom L.M.H. has resided since C.M.L. ("Mother") abandoned the then-two-year-old boy.  The child has speech delays and mild behavioral issues.  Although the referral was determined to

---

[1] On the same date, the trial court terminated the parental rights of L.M.H.'s mother, C.M.L., who did not appeal that order.

be unfounded, CYF stayed involved with the family and advocated for the juvenile court to grant a shelter care order awarding Grandmother physical custody. The order was awarded, and on June 11, 2013, the juvenile court adjudicated L.M.H. dependent. CYS was awarded legal custody and Grandmother retained physical custody. Mother and Father were both granted weekly two-hour periods of supervised visitation. The initial court-ordered permanency goal was reunification with parents and the concurrent goal was placement in kinship foster care. During April 2014, that goal was changed to adoption.

As it relates to Father, the family service plan ("FSP") established several goals and objectives. Father was required to cooperate with CYS and support agencies, avoid substance abuse, demonstrate mental health, exhibit an understanding of L.M.H.'s developmental needs, and learn effective parenting techniques. Additionally, Father was required to provide for his son's basic needs. Over the next sixteen months, Father's compliance with the permanency plan and his efforts to alleviate the circumstances that necessitated placement were minimal. Father submitted to a mental health evaluation during August 2013, wherein he was diagnosed with, *inter alia*, sustained remission for alcohol/cannabis use disorder. Father also completed a drug and alcohol evaluation January 29, 2014, which revealed a substance abuse/dependency issue. Outpatient care

was recommended but Father failed to comply. Additionally, he failed six of the twenty-five drug screens that he submitted between June 2013 and July 2014. On nineteen other occasions, the agency that administered the screens either could not locate Father or Father simply refused to provide a urine sample. In total, Father passed thirteen of forty-four attempted screens. By July 2014, that agency closed Father's case due to its inability to maintain consistent contact with him.

Father also initiated an in-home parenting program through Justice Works; however, he was discharged from that course on May 30, 2014, having only completed approximately one-third of the curriculum. By October 8, 2014, the trial court had determined that Father was noncompliant with the permanency plan and observed that he had made no efforts toward alleviating the underlying circumstances.

Father's visitation was also inconsistent. He attended five to seven visitations with L.M.H. between June and October 2013; however, he failed to attend any visitations between November 2013 and January 2014, and he attended one visitation each during February and March 2014. Father's last visit with L.M.H. occurred on March 4, 2014, approximately nine months before the evidentiary hearing.

On June 13, 2014, CYS filed a petition for the involuntary termination of Father's parental rights to L.M.H. Following a hearing on December 9,

2014, the orphans' court terminated Father's parental rights to L.M.H. pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).[2]  This timely appeal ensued. Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal simultaneously with his notice of appeal.

Father raises one issue for our review:

> Did the Lower Court err as a matter of law and abuse its discretion by granting the request of Children, Youth and Families to terminate the parental rights of Father when CYF presented insufficient evidence to satisfy its burden under 23 Pa.C.S.A. Section 2511(a) and (b) as CYF failed to present sufficient evidence that Father demonstrated a settled purpose of relinquishing his parental claim or that he failed to perform parental rights and further that CYF failed to present sufficient evidence that termination would be in the best interests of the child which is required under each subsection requested by CYF?

Father's brief at 5.

We review the orphans' court's order to grant or deny a petition to involuntarily terminate parental rights for an abuse of discretion. *In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa.Super. 2011).  "We are limited to determining whether the decision of the trial court is supported by competent evidence." *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa.Super. 2004) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa.Super. 2000)).  However, "[w]e must employ a

---

[2] The six-month delay between the date CYS filed its petition for termination of parental rights and the evidentiary hearing was due to the agency's inability to locate Mother and Father and perfect service of the petition.

broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re C.W.U., Jr.*, *supra* at 4. As the ultimate trier of fact, the trial court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id*.

The party petitioning for termination of parental rights "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester,* 555 A.2d 1202, 1203–04 (Pa. 1989).

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the

petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts. In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

Herein, the certified record supports the orphans' court's determination that CYS established the statutory grounds to terminate

- 6 -

Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). As it relates to §2511(a)(1), the pertinent inquiry for our review follows:

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re D.J.S.*, 737 A.2d 283, 285 (Pa.Super. 1999) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)) (internal citations omitted). Although it is the six months immediately preceding the filing of the petition that is the most critical to the analysis, the orphans' court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re B.,N.M.*, 856 A.2d 847 (Pa.Super. 2004). Additionally, to the extent that the orphans' court based its decision to terminate parental rights pursuant to subsection (a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." In *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), we explained, "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all

available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship."

The crux of Father's complaint is that he initiated concerted efforts, prior to the date CYS filed the underlying petition, to maintain contact with H.M.L. and to address his parental deficiencies. Father highlights that between June and October 2013, he consistently participated in the supervised visitations. Father adds that he communicated with his son informally through Grandmother. The latter interactions occurred by telephone and unofficial meetings in the community. Father also stresses that he complied with the requirements to submit to mental health and substance abuse evaluations but could not afford to initiate the recommended treatment programs. In sum, Father argues that the foregoing efforts are sufficient to endure CYS's contentions that he demonstrated a settled purpose of relinquishing parental rights or failed to perform parental duties.[3] For the following reasons we disagree.

_____

[3] Father was imprisoned in York County Prison for two days each during February 2014 and July 2014 and for fifteen days between November 30, and December 14, 2014. Additionally, he was incarcerated in Texas for unspecified periods between April and August 2014. Father does not allege that his periodic incarcerations impeded his ability to maintain a relationship with his son. Nevertheless, to the extent that Father did invoke his
*(Footnote Continued Next Page)*

Instantly, the certified record belies Father's assertion that he made a sincere and genuine effort to perform parental duties or preserve his parental relationship with L.M.H. During the evidentiary hearing, LaShon Smith, the CYS worker assigned to the family, testified that, during the relevant six-month period, Father did not perform any parental duties or provide L.M.H. any gifts or cards. *See* N.T., 12/9/14, at 51. Moreover, for the length of CYS's involvement with the family, Father failed to attend or participate in any medical appointments, and he never inquired about his son's physical, emotional, or developmental wellbeing. *Id*. at 51-52. Tellingly, Father did not participate in any of the assessments and evaluations that L.M.H. underwent in order to qualify for specialized education and early intervention services to address his speech and behavioral needs. *Id*. at 53-54. Indeed, despite the agencies' services, Ms. Smith does not believe that Father is in a position to provide for the care, protection, safety, or development of his son. *Id*. at 52.

*(Footnote Continued)* ────────────

incarceration as an excuse for his inaction, we observe that the certified record confirms that Father failed to exercise reasonable firmness in declining to yield to the obstacles created by imprisonment. *See In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) ("pursuant to an abandonment analysis [an incarcerated parent has] a duty to utilize available resources to continue a relationship with his or her child.").

Ms. Smith stated that Father lacks a legal source of income. *Id*. at 40. She explained that having a verifiable source of stable income was important so that CYS could assess Father's ability to care for L.M.H. if he ever retained custody of the child. *Id*. at 41. Additionally, Father's housing is unquestionably unstable. *Id*. at. 38. Father resided at approximately six different locations since the juvenile court proceedings commenced. *Id*. at 38-39. He failed to inform CYS of his residences, and during one six-month period the agency designated him as "missing in action." *Id*. at 40. In sum, Ms. Smith opined that terminating Father's parental rights would achieve L.M.H.'s best interests because Father failed to remain involved in his son's life and was still unable to provide for the child's basic parenting needs. *Id*. at 54.

In relation to the FSP goals, Ms. Smith indicated that Father participated in a mental health evaluation but did not initiate the recommended counseling. *Id*. at 48. Similarly, Father completed a drug and alcohol evaluation and met the criteria for substance abuse. However, he neglected to document that he engaged in the recommended drug and alcohol counseling. *Id*. at 49. In fact, since Father declined to execute the release of his personal information, CYS was unable to monitor his compliance with any of the recommended treatment regimens. *Id*. at 48-

49. Nevertheless, despite Father's obstructions, CYS never denied him any services that he requested. *Id*. at 57.

Concerning visitation, Ms. Smith testified that Father's attendance at the two-hour weekly visitation was fairly consistent following the June 2013 adjudication of dependency; however, by Spring 2014, Father's compliance with the visitation schedule was abysmal. *Id*. at 42. He only visited with his son twice since October 2013 and the last visit occurred on March 4, 2014. *Id*. at 41-42. The only other visitation that he attended during that period was on February 28, a visit that he cut short.

Tara Deane, a family resource specialist with Justice Works, also testified about Father's inconsistent visitation. While Ms. Deane was scheduled to supervise several two-hour visitations scheduled during February and May 2014, she ultimately supervised only one visitation between Father and L.M.H. The remaining visitations were either canceled by Father or he simply failed to attend. *Id*. at 84-86. Ms. Deane explained that after Father's demonstrated non-compliance, the agency suspended its supervisory services for approximately six weeks with the hope of resuming visitation when Father recommitted to the process. *Id*. at 85. Father called the agency on four occasions during March and April of 2014 to schedule visitations, but three of those visits were canceled after Father failed to confirm his attendance at least twenty-four hours beforehand. *Id*. at 87-88.

Once it became clear to Justice Works that Father would remain noncompliant, the agency closed Father's case permanently during May of 2014. *Id*. at 85-86.

Jared Daughton, the Justice Works parenting educator who provided in-home services to Father, testified about Father's efforts to confront his deficient parenting skills. Mr. Daughton stated that Father completed only about one-third of the program before being discharged. *Id*. at 74. He cited inconsistent attendance and several missed appointments as reasons for the discharge. *Id*. Father missed twelve appointments with Mr. Daughton and canceled on five other occasions. *Id*. at 75. Mr. Daughton explained, "eventually, we missed enough that he would have had to restart the program in order to successfully complete it[.]" *Id*. at 74. He observed that Father's year-long participation was unusual because the program normally takes significantly less time to complete. *Id*. at 77. He added that the lessons that Father actually covered before the discharge were largely introductory and that the lessons geared toward implementing an actual parenting strategy would have come later had Father shown greater participation. *Id* at 76-77.

As demonstrated by the foregoing testimony, CYS provided clear and convincing evidence that Father failed to cultivate a relationship with his son or perform his parental duties. After a reasonably strong start, during the

duration of this case, including the six months that are most critical to the §2511(a)(1) analysis, Father was content to delegate his parental responsibilities to Grandmother. Despite CYS's encouragement to avail himself of all of the services and opportunities that it and Justice Works provided to him, Father refused to persevere and eventually lost interest in achieving his FSP goals or maintaining contact with his son. He was discharged from the parenting program for non-participation, he failed to follow through with the recommended mental health and substance abuse counseling, and most importantly, he squandered his visitations with his young son. Thus, the record sustains the orphans' court's conclusion that CYS proved by clear and convincing evidence the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(1). Stated simply, Father failed to exercise reasonable firmness in attempting to establish a parental relationship with L.M.H. or in performing his parental obligations.

Having concluded that the orphans' court did not err in finding that CYS satisfied its burden pursuant to 23 Pa.C.S. § 2511(a)(1), we next review the orphans' court's needs and welfare analysis under § 2511(b). While the Adoption Act does not mandate that the orphans' court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the orphans' court's bond-effect analysis depends upon the circumstances of a particular case. ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the orphans' court when determining what is in the best interest of the child. ***In re K.K.R.-S.***, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. ***See In re T.D.***, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in ***In re K.Z.S.***, ***supra*** at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

***See also In re A.S.***, ***supra*** at 483 (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability

- 14 -

child might have with the foster parent, and importance of continuity of existing relationships).

Herein, the orphans' court concluded that terminating Father's parental rights and freeing L.M.H. for adoption was in the child's best interest. The orphans' court proffered the following needs and welfare analysis.

> Finally, the Court must consider the effect that termination will have upon the [four-year-old] Child. The Court believes that termination of parental rights will have no significant effect upon the Child. . . . Regarding Father, [t]he Court believes that Child would recognize Father. The Court acknowledges that a strong bond once existed between Father and the Child, however, that bond became a playmate bond when Father failed to maintain consistency in his visitation and failed to maintain a place of importance in the Child's life. For the last fourteen months, there have been only two visits wherein Father visited the Child and had real interaction with the Child. The last of those visits was more than nine months ago. During this entire period, paternal grandmother has been caring for the Child daily and consistently. The Child looks to paternal grandmother for love, security, safety and basic needs. The bond between the Child and paternal grandmother is the kind of healthy bond that should exist between a parent and child.
>
> This Court believes that permanency will best be achieved by terminating parental rights, and permitting paternal grandmother to move forward with adoption.

Trial Court Adjudication and Opinion, 1/5/15, at 12-13. In sum, the court opined,

> [N]o real parent-child bond exists in this case. Father has not been able to consistently provide the Child with the love, comfort, security or closeness that would normally be evident between a parent and child. . . . The Child looks to Father as a

- 15 -

> playmate, but looks to paternal grandmother to provide comfort, safety, security and nurturance. . . . The Court finds that there would be no significant effect upon the child from the termination of . . . Father's parental rights. Termination of parental rights will best meet the needs of the Child and will permit him to move forward and achieve the permanency that he deserves.

*Id*. at 16.

Father argues that CYF failed to demonstrate that terminating parental rights would not have a detrimental impact upon L.M.H. This contention relies upon the recognized bond that he shares with his son. In essence, Father challenges the trial court's determination that the once-strong parental bond had diminished so significantly so as to alleviate the effects that terminating Father's parental rights would have upon L.M.H.

The certified record sustains the orphans' court's rationale. During the hearing, Ms. Smith testified that while L.M.H. knew Father and shared a strong bond with him when Father had remained engaged in the reunification process, she has been unable to ascertain the current nature of the relationship due to Father's absences. *See* N.T., 12/9/14, at 46. She observed, however, that sometimes when Father called on the telephone, L.M.H. refused to speak with him. *Id*.

Mr. Daughton supervised approximately four of Father's visitations with L.M.H. as part of the parenting program that he administered. *Id*. at 76. He testified that Father demonstrated a strong bond with the child, but

sometimes lacked the instinct to determine his son's needs. *Id*. at 76, 79. Noting that the two frequently played together on the floor, he stated that Father "seemed to be invested in his relationship with [L.M.H.] during those **early** visits." (emphasis added). *Id*. Similarly, Ms. Deane described the one interaction that she observed between Father and L.M.H. as playful and noted that Father chased L.M.H. around the room. *Id*. at 83.

In contrast to this playful bond, L.M.H. maintains a strong parental bond with Grandmother, whom he perceives as his primary parental figure. *Id*. 45, 46-47. Ms. Smith testified that Grandmother has been the primary caretaker for the past two years, "He knows that she's going to maintain his safety. She provides for him. She shows him love. He identifies [Grandmother as] the person who protects him." *Id*. at 47. Ms. Smith opined that, of the adults in L.M.H.'s life, he has the strongest parental bond with Grandmother, and that bond is the most important to cultivate. *Id*. She continued, "[L.M.H.] has become accustomed to living with [G]randmother. . . . He knows [G]randmother [is] his caregiver . . . , and that's who he's been with. Terminating the rights of his parents, he's not going to feel an impact because he doesn't see them at this time now." *Id*. at 56. Overall, Ms. Smith concluded that terminating Father's parental rights would permit L.M.H. to continue to reside with Grandmother in a stable home like a typical four-year old boy. *Id*. at 56.

Accordingly, in light of the evidence demonstrating the absence of a parent-child bond between L.M.H. and Father and the favorable relationship that L.M.H. shares with Grandmother, our review of the certified record supports the orphans' court's determination that terminating Father's parental rights best satisfied L.M.H.'s developmental, physical, and emotional needs and welfare.

For all of the foregoing reasons, we affirm the orphans' court order terminating Father's parental rights to L.M.H. pursuant to § 2511(a) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/15/2015